IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: VARIOUS ELECTRONIC DEVICES FURTHER DESCRIBED IN ATTACHMENT A, ALL CURRENTLY LOCATED AT THE FBI LIMA RESIDENT AGENCY, 401 WEST NORTH STREET, SUITE 200, LIMA, OHIO | Case No. 3:20MJ5299 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Andrew J. Eilerman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI), and, have been since May 2008. I am currently assigned to the Cleveland Division. I worked in the same capacity in the Cincinnati Division, Dayton Resident Agency and the Minneapolis Division, Grand Forks, North Dakota Resident Agency. I have investigated the commission of federal crimes involving criminal offenses and national security matters to include counterintelligence investigations, violent crimes, and drug trafficking. In the course of these duties, I have participated in numerous federal search and arrest operations and conducted associated interviews which have resulted in the collection of evidence and admissions of multiple criminal violations.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. The property to be searched is described as follows:

a. APPLE IPAD, MODEL A1823, S/N: GCGVD6J7HLJJ (WCOCTF Inventory Michael Avenue Item 3);

b. WHITE APPLE IPHONE (WCOCTF Inventory Michael Avenue Item 6);

c. BLACK CELL PHONE WITH CASE (WCOCTF Inventory Michael Avenue Item 4);

d. BLACK CELL PHONE WITH CASE (WCOCTF Inventory Michael Avenue Item 5);

e. DELL LAPTOP, S/N: HL42GC2 (WCOCTF Inventory Michael Avenue Item 2);

f. SAMSUNG NOTEBOOK, S/N: 1BEF9FBFA18958Y (WCOCTF Inventory Michael Avenue Item 12);

g. SAMSUNG CHROMEBOOK, S/N: 1BFY91HM727409K (WCOCTF Inventory Hazel Avenue Item 5);

h. APPLE MACBOOK, MODEL: A1466, S/N: C0ZWD2WYJ1WK (WCOCTF Inventory Hazel Avenue Item 4);

i. WHITE APPLE IPHONE WITH CASE (Seized from TAYLOR'S person);

j. WHITE/GOLD/ROSE APPLE IPHONE (WCOCTF Inventory Hazel Avenue Item 16);

k. APPLE IPAD, MODEL A1823, S/N: F9FTRVTDHCJJ (WCOCTF Inventory Hazel Avenue Item 3);

hereinafter collectively referred to as the "Devices." The Devices are currently located at the FBI Lima Resident Agency, located at 401 West North Street, Suite 200, Lima, Ohio.

5. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. On or about July 2, 2020, the FBI received information from a known individual, hereinafter referred to as a cooperating witness (CW), about an individual identified as ANDREW TAYLOR. The CW reported the existence of a large-scale fentanyl operation occurring at 705 Michael Avenue, Lima, Ohio. The CW identified TAYLOR as the source of supply, and a distributor, for this fentanyl operation.

7. Around the same time frame, your Affiant was contacted by an Ohio Bureau of Criminal Investigation Special Agent, who also happens to be a Task Force Officer (TFO) with the Cincinnati Office of the FBI. This SA/TFO was investigating drug trafficking occurring over the dark web. During his investigation, the SA/TFO identified a male known only to him as "Shorty" who was involved in drug trafficking over the dark web. The SA/TFO later identified that "Shorty" was in fact TAYLOR, with a possible residence address of 705 Michael Avenue, Lima, Ohio.

8. Your Affiant and other members of the Northwest Ohio Safe Streets Task Force (NWOSSTF) conducted surveillance on multiple occasions in July 2020 in the vicinity of 705 Michael Avenue, Lima, Ohio, and were unable to locate TAYLOR.

9. On July 13, 2020, members of the NWOSSTF again were conducting surveillance in the vicinity of 705 Michael Street, Lima, Ohio, when a male matching the physical description of TAYLOR was seen exiting the 705 Michael Avenue residence. This male got into a black four-door sedan and drove to a residence located at 1405 Hazel Avenue, Lima, Ohio. Investigators continued to conduct surveillance at this Hazel Avenue residence for several hours

until an arrest warrant for TAYLOR was verified through the U.S. Marshal's Office in Fort Wayne, Indiana.  Once the arrest warrant was verified, investigators obtained a state search warrant for the Hazel Avenue residence to obtain the body of TAYLOR.

10.     On July 14, 2020 at approximately 12:20 a.m., investigators executed the search warrant at 1405 Hazel Avenue, Lima, Ohio looking for TAYLOR.  TAYLOR was arrested as he fled from a detached shed on the rear side of the residence.  Upon his arrest, TAYLOR was found to have a WHITE APPLE IPHONE WITH CASE, identified in paragraph 4(i), in his possession.  As TAYLOR was taken into custody, investigators observed in plain view inside the shed he had run from a large press used to press illegal narcotics into pill form and a large amount of suspected narcotics.  Based on these observations, investigators obtained state search warrants for the residences located at 1405 Hazel Avenue and 705 Michael Avenue in Lima, Ohio, each of which authorized the seizure of narcotics and related items.

11.     On July 14, 2020 at approximately 3:40 a.m., investigators executed the narcotics search warrant at the Michael Avenue residence. Investigators seized the following Devices from the master bedroom of the Michael Avenue residence:  APPLE IPAD, MODEL A1823, S/N: GCGVD6J7HLJJ (WCOCTF Inventory Item 3); WHITE APPLE IPHONE (WCOCTF Inventory Item 6); BLACK CELL PHONE WITH CASE (WCOCTF Inventory Item 4); BLACK CELL PHONE WITH CASE (WCOCTF Inventory Item 5); DELL LAPTOP, S/N: HL42GC2 (WCOCTF Inventory Item 2); and a SAMSUNG NOTEBOOK, S/N: 1BEF9FBFA18958Y (WCOCTF Inventory Item 12). Also seized from the Michael Avenue location was various suspected illegal narcotics (including from the master bedroom), multiple firearms and hand-written notes about the dark web.

12.     On July 14, 2020 at approximately 5:47 a.m., investigators executed the narcotics search warrant at the Hazel Avenue residence. Investigators seized approximately 11.5 kilograms of suspected fentanyl, suspected fentanyl pills, a pharmaceutical grade pill press and the following Devices from the detached shed at the Hazel Avenue residence: SAMSUNG CHROMEBOOK, S/N: 1BFY91HM727409K (WCOCTF Inventory Item 5); APPLE MACBOOK, MODEL: A1466, S/N: C0ZWD2WYJ1WK (WCOCTF Inventory Item 4); WHITE/GOLD/ROSE APPLE IPHONE (WCOCTF Inventory Item 16); and an APPLE IPAD, MODEL A1823, S/N: F9FTRVTDHCJJ (WCOCTF Inventory Item 3).  Also seized from the shed at the Hazel Avenue location was a large amount of suspected narcotics, including pills, powders, multiple firearms and over $120,000 in U.S. currency.

13.     On July 27, 2020, investigators interviewed TAYLOR.  TAYLOR was being held on a federal supervised release warrant at the Corrections Center of Northwest Ohio (CCNO). Prior to the interview, TAYLOR was advised of his Miranda rights, which he acknowledged, and agreed to answer investigators' questions.  During the interview, TAYLOR acknowledged that he had been living at the Michael Avenue address with his girlfriend.  He further stated that he had recently purchased the residence on Hazel Avenue approximately one month prior although the deed had not yet transferred into his name.  TAYLOR acknowledged his role in the distribution of fentanyl pills.  Specifically, TAYLOR stated that while he was residing in Lima, he sold large amounts of fentanyl pills and/or other controlled substances to three different individuals who he identified by name or moniker, all of whom are well-known to law enforcement officers in the Lima, Allen County, Ohio area as being involved in narcotics trafficking. TAYLOR further acknowledged that the firearms and money seized belonged to him.

14. Investigators are aware narcotics' traffickers routinely use multiple residences to store their illegal narcotics, placing reserve amounts of their illegal narcotics away from their base of operation in an effort to mitigate the possibility of recovery by law enforcement.

15. Based on my training and experience I know the following to be true:

a. Drug dealers and people involved in criminal activity commonly use cell phones, computers, and tablets to conduct illegal business, including, but not limited to, facilitating drug transactions, drug ledgers, financial transactions and/or records, photographs of evidence and/or drug associates, contact lists of drug associates, and are used to monitor law enforcement communications.

b. It is not uncommon for drug dealers to possess multiple types of illegal drugs to supply their customers and/or for personal use.

c. Violence goes hand and hand with drug activity. Drug dealers commonly possess firearms and other weapons to protect their product, their assets, and themselves. As well as security cameras and security monitors to protect their product, their assets, and themselves.

d. Drug dealers and people involved in criminal activity commonly possess large amounts of money because they obtained the money through illegal means and do not want the money tracked.

e. Persons located in residences which conduct drug related activity are usually transient and only stay for the amount of time required for them to complete their drug transactions and then leave, usually concealing the purchased narcotics on their person as they exit the residence.

16. The Devices are currently in the lawful possession of the FBI. They came into the FBI's possession after being transferred custody from the West Central Ohio Crime Task Force (WCOCTF). WCOCTF came into possession of the items when they was seized during execution of the state search warrants described in paragraphs 11 and 12 of this Affidavit. Therefore, while the FBI might already have all the necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

17. The Devices are currently in storage at the FBI Lima Resident Agency, located at 401 West North Street, Suite 200, Lima, Ohio. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the WCOCTF and then the FBI.

18. Based on my training and experience I know that the Devices have capabilities that allow them to serve as electronic storage devices, including the storage of photographic and video images. Additionally, I believe that evidence of the crimes listed, including photographic evidence, may have been recorded and stored on the Devices. Further, I believe that examination of the Devices will further identify additional conspirators and the role each conspirator played in the conspiracy.

## **TECHNICAL TERMS**

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a

      variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f. Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

    g. Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

    h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA**.**  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Andrew J. Eilerman
Special Agent
Federal Bureau of Investigation

Sworn to via telephone on this 24th day of September, 2020 after submission by reliable electronic means
Fed.R.Crim.P. 4.1 and 41(d)(3).

JAMES R. KNEPP, II
UNITED STATES MAGISTRATE JUDGE